470 A.2d 150

**COMMONWEALTH of Pennsylvania**

v.

**Jerome HARRIS, Appellant.**

Superior Court of Pennsylvania.

Submitted Sept. 30, 1983.

Filed Dec. 16, 1983.

John A. Halley, Pittsburgh, for appellant.

Robert L. Eberhardt, Deputy District Attorney, Pittsburgh, for Commonwealth, appellee.

Before WICKERSHAM, ROWLEY and POPOVICH, JJ.

POPOVICH, Judge:

This is an appeal from the Order of the Court of Common Pleas of Allegheny County denying appellant's, Jerome Harris', Post-Conviction Hearing Act (PCHA) Petition. 19 P.S. § 1180–1 *et seq.*, as amended; reenacted as 42 Pa.C. S.A. §§ 9541–9551. We reverse.

A review of the record reveals that on July 19, 1975, a complaint was filed against the appellant charging him with robbery, aggravated assault and the attempted murder of Eula Everson. Out of this incident arose the additional charge of murder as to Mrs. Everson's husband, who was shot in the head by the appellant. Further, although not related to the Everson matter, appellant was charged with the killing of one Ernest Rozier. Given the three cases lodged against the appellant, the District Attorney's office decided to list them all for trial on December 15, 1975. One assistant district attorney was assigned to prosecute the cases.

In preparation for trial, the District Attorney's office had anticipated that the Everson cases would be consolidated. However, in preliminary discussions with the trial judge, it became apparent that the judge was not receptive to the idea. As a result, appellant was tried first for the Thurmond Everson shooting and was found guilty by a jury on December 19, 1975.[1] Because no jurors were brought in

---

1. As for the Rozier case, appellant ultimately pleaded guilty and appealed from the judgment of sentence on grounds of a violation of Pa.R.Crim.P. 1100 and the involuntariness of the plea. This appeal was remanded by our Supreme Court for the taking of testimony on

during the last two weeks of December, 1975, the earliest the Eula Everson case could begin was January 5, 1976, the next scheduled session for jury trials. Notwithstanding this fact, the assistant district attorney, testifying at the PCHA hearing ordered by this Court (*see Commonwealth v. Harris,* 286 Pa.Super. 135, 428 A.2d 609 (1981)), stated he could not litigate the Eula Everson case immediately upon his return from the Christmas and New Year holidays on January 5, 1976, because he had been given another case for that date. He knew this in advance because it was the practice of the District Attorney's office to publish the trial list, with the name of the attorney assigned to the case, months before the scheduled trial date. The assistant district attorney recalled that all of this was "discussed at the time" the pretrial meeting occurred between counsel and trial judge, although "not of record." In particular, he remarked:

> ... I can't quote the exact words that were used but the substance of it was that if this consolidation [between the Eula Everson and Thurmond Everson cases] were [sic] not going to be granted it was, in effect,—it was going to throw us into a bind in a lot of ways. And I pointed out that we would not be trying cases in the last two weeks of 1980 [sic—1975] and I also pointed out that I would be going to trial on the 5th of January. The question of when the Eula Everson trial could begin would be a problem. The Rozier case had to be tried. We anticipated it would be tried as soon as I was available after January.[2] So we discussed an extension on both of

the issues raised. *See Commonwealth v. Harris,* 492 Pa. 381, 424 A.2d 1242 (1981).

---

**2.** In point of fact, the Commonwealth filed a petition for an extension of time under Pa.R.Crim.P. 1100(c) which the trial court granted on December 21, 1975, specifying that trial should begin by April 15, 1976. However, on April 5, 1976, appellant pleaded guilty to homicide generally. *See* note 1, *supra.* Thus, contrary to the impression created by the assistant district attorney, there is evidence to indicate that the Rozier murder trial did not create an impediment to proceeding to trial on the Eula Everson case until "after January" of 1976.

them. We talked about a time frame. I can't tell you at this moment just exactly what time frame we agreed upon or discussed or had in mind but I know at that time I indicated that a petition for extension of time would be drawn up reflecting what we had discussed and that is where we ended those discussions that day before we actually started the trial.

(N.T. 9/2/81 at 12)

Further, the assistant district attorney did not recollect counsel for the appellant offering any strong objections to "the extension of time process." As recalled by the assistant district attorney, counsel for the appellant "recognized in the course of his duties exactly what was going to be necessary and *acknowledged* that that is the way it was going to have to go." (Emphasis added) A review of the record discloses the opposite. For example, counsel for the appellant testified at the PCHA hearing that he never requested that the Eula Everson case be postponed because he was ready to try all three cases—Eula, Thurmond and Rozier—"at any time." Although he could not remember if the assistant district attorney had made any specific requests of him to agree to an extension of the Eula Everson case after the Thurmond Everson murder trial, counsel for the appellant stated, "If he had, I would have said no." This aversion by appellant's counsel to prolonging the adjudication of any of his client's cases was not neutralized by the petition to extend filed by the Commonwealth on January 5, 1976, regarding the Eula Everson assault trial.

■ At the PCHA proceeding, counsel for the appellant conceded receiving the petition to extend. Nonetheless, he testified to obtaining notice of the petition "the day after the hearing was set in the petition." In other words, "If the hearing was set for the 5th of January, then [he] received it on the 6th." That same day, counsel phoned the District Attorney's office and spoke to the secretary in charge of homicides and was told that the petition to extend

See *Commonwealth v. Harris,* 492 Pa.Super. 381, 424 A.2d 1242 (1981) and discussion *infra.*

was signed by the court. Counsel did not complain to this purported *ex parte* hearing, as is evident by the fact that he could offer no reason for failing to raise the Rule 1100 issue in post-trial motions or on prior appeal. The Commonwealth could not refute this point, except by pure speculation as to appellant's counsel's presence at the extension hearing. No affirmative proof could be produced to establish the legitimacy of the proceeding. In dealing with this subject in appellant's initial appeal, this Court observed:

> In the case before us, the petition to extend was granted to the Commonwealth without giving appellant the opportunity to contest it. Rule 1100(c) necessitates notice and a hearing before the grant of an extension of the run date. Therefore, appellant's claim that the extension was procedurally deficient is obviously of arguable merit.

*    *    *    *    †    *

> Our finding that counsel was ineffective [since he could not state a reason for his failure to preserve the Rule 1100 issue on appeal] does not necessarily mean that the contention would have prevailed if it had been pursued. *The Commonwealth has alleged that the extension was warranted because of a crowded court docket. However, this allegation, in the absence of evidence in the record, is insufficient to show that the Commonwealth used due diligence in bringing the accused to trial.* (Emphasis added)

*Commonwealth v. Harris, supra,* 286 Pa.Super. at 137–138, 428 A.2d at 610. What is to be garnered from the aforesaid is that the Commonwealth had the burden of proving, by a preponderance of the evidence, that it exercised due diligence in trying to bring appellant to trial by January 15, 1976, which was the 180th day after the filing of the complaint. Appellant was tried on March 25, 1976.

■ We find that the Commonwealth failed to establish that a "crowded court docket" or any other reason excused its bringing the appellant to trial more than 2½ months after the Rule 1100 run date.

Preliminarily, we wish to emphasize the seriousness with which this Court approaches the task of reviewing a Rule 1100 claim. It would be very easy for this Court to affirm perfunctorily a conviction on appeal, especially in a case in which a jury has found the appellant guilty as charged and hold that substantial justice has been accomplished. To do so, however, would be in direct conflict with our sworn duty to apply the law even-handedly as interpreted by our Supreme Court and not be swayed by collateral matters. *See, e.g., Commonwealth v. Alexander,* 318 Pa.Super. 344, 464 A.2d 1376 (1983) (ROWLEY, J., Concurring Statement). To that end, we will examine the arguments proffered by the Commonwealth to justify its asserted inability to bring the Eula Everson case to trial sooner than it did adjudicate the matter.

First, the Commonwealth avers that the assistant district attorney had "reasonably anticipated" that the Everson cases would be consolidated, and, when they were not, "[s]uch denial initiated the problem." The Commonwealth laments that "in all fairness [the Everson cases] should have been consolidated[, for e]ven the trial judge who denied the motion to consolidate has made statements to this effect." (Commonwealth's Brief at 10) As regrettable as this may be, even assuming for the sake of argument that such a motion was filed, though the record does not substantiate such a fact, the motion was denied and this action took place prior to the commencement of any of the three cases involving the accused. Consequently, the Commonwealth had the option of seeking a continuance in any or all of the cases, or assigning separate counsel to try those cases in which a Rule 1100 problem was apparent. As we shall see, the Commonwealth took neither of these routes. Accordingly, we cannot agree with the Commonwealth, at least at this stage of the discussion, that it acted with due diligence. To do so would be tantamount to penalizing the defendant for the Commonwealth's miscalculation in assessing the temperament of the trial court and the strength of its consolidation argument. This is especial-

ly so because consolidation is a matter left to the sound discretion of the trial court, *see Commonwealth v. Hill,* 479 Pa. 346, 388 A.2d 689 (1978), and is not to be granted *pro forma.* Additionally, we need not pass judgment on the propriety of the trial court's purported denial of the joinder motion by the prosecution since this issue is not before us on appeal.

We now turn to the second of the Commonwealth's averments, which we find facially appealing, but substantively unpersuasive, in that to have assigned the Eula Everson case to another assistant district attorney would not have accelerated its disposition. This contention is premised on the view that the witnesses who would have testified in the Thurmond Everson case would also have had to appear in Eula Everson's trial because both incidents arose out of the same fact situation, i.e., appellant entered the Everson home and in the course of burglarizing the residence he shot Mr. Everson and assaulted Mrs. Everson. So, until the Thurmond Everson case was completed, the charges arising out of the Eula Everson incident could not proceed to trial.

Accepting the position espoused by the Commonwealth is not dispositive of the Rule 1100 issue, inasmuch as the Thurmond case was completed by Friday, December 19, 1975, and, thus, left the remaining time up to the January 15, 1976, run date to try the Eula Everson case. The facts recited by the Commonwealth do nothing more than account for the time leading up to January 5, 1976. Even conceding that the period preceding the January 5, 1976, start-up of the Allegheny County court system was legitimately excusable as a holiday session in which jury trials were not conducted, we are still left with the reality of justifying the delay between January 5 and January 15, 1976.

This we cannot do.

The Commonwealth would have us believe that because the assistant district attorney handling the Everson case "had been assigned to try the case of *Commonwealth v. Boyd*" upon his return from vacation on January 5th and because the 5th was also the date the Commonwealth

presented its petition for an extension, "the evidence clearly shows that an extension of time was warranted and the trial court did not err in granting the petition." Thus, the Commonwealth urges that we sustain the decision of the lower court. (Commonwealth's Brief at 11–12) An examination of the evidence discloses the flaws in the Commonwealth's arguments.

To start with, at the PCHA hearing, the following illuminating question was asked of the assistant district attorney by counsel for the Commonwealth:

Q  Okay. Based on my understanding of the homicide case load and that time period, the case of Commonwealth versus Charles Boyd, that was listed for January 5th, 1976 did not ultimately come off on January 5th, 1976 and in that regard is there any reason why at that point you could not have moved to get the Eula Everson case tried within the final trial date which was January 15, 1976?

A  *Well, I don't know of any specific reason why.* When the Boyd case came up on the 5th and ultimately turned out to be postponed, at this point we had already agreed upon—we had agreed for the time frame for the Eula Everson case. Those cases, as far as I was concerned,—both Rozier and Eula Everson— that that time frame was already fixed. That is my recollection. There was never any reason that we should move it up or ask to have it listed on the 6th or 7th or 8th of January because Mr. Nauhaus [—appellant's trial counsel—] had already acknowledged and discussed the question of when that case would be listed.

(N.T. 9/2/81 at 13–14)  (Emphasis added)

The assistant district attorney's statement attributing appellant's trial counsel with some type of acquiescence ("acknowledgement and discuss[ion] of the question") as to an extension is refuted by the record. As noted in the earlier portion of this Opinion, when appellant's trial counsel testified at the PCHA hearing concerning the circumstances

attendant to a petition to extend, he specifically stated he "never" requested a postponement in any of the three cases in which his client was to be tried. (N.T. 9/1/81 at 5) Although he was candid that he could not remember a discussion with the assistant district attorney concerning a specific request by him (ADA) to obtain an extension, he testified, "If [the assistant district attorney] had, [he] would have said no." (N.T. 9/1/81 at 7) Staying for a moment longer on this subject of an extension, we note that a panel of this Court already has held that because the appellant (or, for that matter, his trial counsel) was not afforded the opportunity to contest the Commonwealth's petition to extend when presented to the court below,[3] it was "procedurally deficient." *See Commonwealth v. Harris, supra,* and *Commonwealth v. Daniels,* 288 Pa.Super. 69, 431 A.2d 291 (1981) (Dissenting Opinion by POPOVICH, J.). Therefore, the question of the propriety of an extension has been ruled upon ("finally litigated" on its merits, *see Commonwealth v. Hobson,* 286 Pa.Super. 271, 428 A.2d 987 (1981),) and this forecloses this present Court from again delving into the matter.

Having scrutinized the record in an attempt to determine if the Commonwealth had proven, by a preponderance of the evidence, that it acted with due diligence in bringing the appellant to trial sooner than it did (March 25, 1976), we can

3. We note in passing that the PCHA judge, who also presided over the pre-trial proceedings relevant to the case here, offered that, as to the extension petition by the Commonwealth, he "wouldn't have signed an Order ex parte if [he] thought it was contested—this [was his] feeling." (N.T. 9/2/81 at 39) However, he did go on to say, "... well, this would be speculation on [his] part, ... but this is how [he] fe[lt] about the matter[.]" *Id.*

We find it interesting, although not dispositive of this issue because it appears in the trial court's opinion dated January 3, 1980 and thus is not the type of record evidence upon which an appellate court is to base its decisions (*see Commonwealth v. Rini,* 285 Pa.Super. 475, 427 A.2d 1385 (1981)), that the trial judge wrote, albeit the order granting the petition to extend indicates that it was signed on January 13, 1976, "that date was filled in sometime after the order was signed." (Trial Court Opinion at 2, n. 1) The testimony of trial counsel for the appellant indicates that he learned on January 6, 1976 that an order granting the Commonwealth's petition had been signed by a judge on January 5, 1976. (N.T. 9/1/81 at 8–9) (Trial Court Opinion at 2, n. 3)

say that no evidence has been presented that even hints that a "crowded court docket" (*see Commonwealth v. Harris, supra*) was to blame in precluding the prosecution from trying the appellant between January 5 and January 15, 1976. *Compare Commonwealth v. Walls*, 303 Pa.Super. 284, 449 A.2d 690 (1982), petition for *allocatur* denied on January 31, 1983. The only witnesses to testify on this matter were the assistant district attorney, whose reasons for the delay were reproduced in the Commonwealth's brief and responded to by this Court, *supra*, and Virginia Miranda, a secretary for the homicide attorneys in the District Attorney's office.

Ms. Miranda testified that she was responsible for preparing certain records and keeping track of the listing of homicide cases as they progressed through the criminal process. Additionally, the witness, as she was asked to do by the Commonwealth's PCHA attorney, prepared a schedule of all homicides listed from November of 1975 through March of 1976. The witness described the document prepared by her, since it is not of record, as having three columns. The first contained the defendants' names, followed by a date which reflected when the case was initially scheduled for trial. The next column was captioned "subsequent listings" and contained either a second or third listing for a particular defendant regarding trial. The last column indicated the assistant district attorney who was assigned to the case. The remaining portion of the witness' direct examination consisted of a confirmation that the assistant district attorney involved in the case *sub judice* was designated to litigate the *Commonwealth v. Boyd* case on January 5, 1976 and her document accurately indicated a true count of the homicide cases as to the period in question. However, no actual figure as to the number of cases per assistant district attorney was mentioned.

Nonetheless, of interest to this Court is the fact that the witness did testify on cross-examination that, although the 12 or 14 names of the assistant district attorneys appearing on her homicide trial list were all those involved in that type

of work in 1976, there were "about 17" "assistant D.A.'s ... in the trial division in the District Attorney's office in late 1975, 1976[.]" (N.T. 9/1/81 at 21) This would lend credence to the argument that if the assistant district attorney handling the Everson and Rozier cases was inundated with work (*see* N.T. 9/2/81 at 14–15), so as to hamper his ability to try the appellant before the 15th of January of 1976 for the Eula Everson matter, there were *at least* 3 other non-homicide attorneys whose work schedule may have been less congested. Since the Commonwealth has presented *no evidence* to rebut this corollary, or, stated differently, because it has failed to meet its burden of proof, we are left with little alternative but to reverse the Order of the PCHA court and grant the appellant the relief requested.[4] *See Commonwealth v. Alexander, supra.*

Order reversed.

WICKERSHAM, J. filed a dissenting opinion.

**4.** We wish to mention that in examining the Rule 1100 decisions filed in this Commonwealth, a pattern has emerged that seems to pervade some, if not all, of the District Attorneys' offices. That is, in an effort to avoid a violation of the court-created 180-day speedy trial rule, District Attorneys have been required to engage in "calendar-watching." The Court finds this practice reminiscent of the "clock-watching" done by the police after our Supreme Court's decision in *Commonwealth v. Davenport,* 471 Pa. 278, 370 A.2d 301 (1977).

Just as our Supreme Court seems to be questioning the continued practicality of the six-hour *Davenport* rule, *see Commonwealth v. Crowley,* 502 Pa. 393, 466 A.2d 1009 (1983); *Commonwealth v. Keasley,* 501 Pa. 461, 462 A.2d 216 (1983) (Concurring Opinion by McDERMOTT, J.), it may be time "to examine the continuing viability of our decisions [in Rule 1100, concerning the implacable 180-day time clock, because] ... the need to requires." *Commonwealth v. Daniels,* 288 Pa.Super. 69, 77 n. *, 431 A.2d 291, 295 n. * (1981) (Dissenting Opinion by POPOVICH, J.). We believe that if a speedy trial violation is claimed, the more realistic gauge to assessing the Commonwealth's actions would be to utilize either a "totality of circumstances" approach (*see, e.g., Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) or a "prejudice to the defendant" test as existed under *Commonwealth v. Futch,* 447 Pa. 389, 290 A.2d 417 (1972). *See also Commonwealth v. Walls,* 303 Pa.Super. 284, 290 n. 13, 449 A.2d 690, 693 n. 13 (1982), petition for *allocatur* denied on January 31, 1983; *Commonwealth v. Fairley,* 298 Pa.Super. 236, 241, 444 A.2d 748, 751 (1982).

WICKERSHAM, Judge, dissenting:

The underlying facts of this case were accurately set forth in appellee's brief as follows:

The appellant, Jerome Harris, was charged by criminal indictment returned by the Grand Jury of Allegheny County at No. CC7505589A with Robbery, Aggravated Assault, and Attempted Murder.

On January 5, 1976, the Commonwealth filed a Petition to Extend Time and said petition and notice of the hearing were served upon counsel for the appellant. The motion was granted on January 13, 1976 and the time within which to commence trial was extended until April 15, 1976.

On March 24, 1976, the appellant proceeded to trial by jury before the Honorable John W. O'Brien. At trial, the appellant was represented by Lester Nauhaus, Esquire, of the Office of the Public Defender of Allegheny County. The court granted the demurrer of the appellant to the Robbery charge but the jury found the appellant guilty as to the Aggravated Assault and Attempted Murder charges.

On April 5, 1976, appellant filed a Motion for New Trial/Arrest of Judgment. This motion was denied on November 8, 1976 and on November 30, 1976, the court sentenced the appellant to undergo imprisonment for not less than five (5) nor more than twenty (20) years.

Notice of Appeal to the Superior Court was filed on December 23, 1976. Judgment of sentence was affirmed by the Superior Court at No. 367 April Term, 1977. A petition for allocatur to the Supreme Court was denied on October 30, 1978.

The facts of the crime may be briefly and accurately summarized as follows:

However, we, as an intermediate appellate court, cannot overrule our Supreme Court's decisions. It is for our high Court to re-examine, and, if it sees fit, to modify or abrogate, such a time-oriented rule.

In the early hours of Sunday morning, July 6, 1975, Thurman and Eula Everson were preparing to retire for the night. While in the bathroom, Eula Everson heard a knock at the house door and her husband admitted a guest. (TT 339) [1]

Some time later, Mrs. Everson heard a noise like a firecracker (TT 350); suddenly a man entered her room to assure her everything was alright. (TT 352) As Mrs. Everson went to check on the safety of her husband, she was hit over the head and knocked unconscious before reaching her husband. Subsequently, upon reviving, she was able to call the Clairton Police. (TT 355) While in the hospital for treatment of her injuries, she identified appellant as the man who entered her room by selecting his picture from a photographic array. (TT 352, 361, 362–364, 385)

Appellant was arrested on view on July 13, 1975, at 24 Vince Street, Pittsburgh, Pennsylvania, as an escapee from Graterford Prison. During the course of the arrest, a gun was seized from a cupboard shelf in the apartment where appellant was found. (TT 319) Ballistics tests showed that the bullet taken from Mr. Everson was fired from the gun seized during appellant's arrest. (TT 327) Appellant was subsequently charged with the offenses against Mr. Everson.

Appellant filed a petition under the Post Conviction Hearing Act, claiming a violation of Rule 1100 and seeking dismissal of the indictment filed against him. During the hearing on the petition held on January 3, 1979, the court treated the petition as one claiming ineffectiveness of trial counsel for failing to preserve a Rule 1100 objection during the post-trial motions and the petition was argued accordingly. The petition was denied on July 12, 1979. On August 13, 1979, a timely Notice of Appeal was filed by appellant.

The Superior Court, No. 742 April Term, 1979, remanded the present case for hearing on whether the Common-

wealth exercised due diligence in bringing defendant to trial speedily.

On September 1, 1981, such hearing was conducted and on September 2, 1981, it was held that the Commonwealth exercised due diligence in bringing appellant to trial speedily. This appeal followed.

[1] Numerals in parentheses preceded by the letters "TT" refer to the pages of the Trial Transcript.

I agree with the analysis of the Honorable John W. O'Brien who found that petitioner's Rule 1100 rights had not been violated. He said:

Edward Fagen, Deputy Assistant District Attorney in charge of the Homicide Division for Allegheny County in 1975 and 1976, testified that during that time period the Administrative Judge of the Criminal Division would not assign more than two homicide cases per week because of the volume of cases on the general trial list. He further testified that in December of 1975 over 200 homicide cases were pending. Other problems relating to the listing of homicide cases for trial in December of 1975 were the limited number of Assistant District Attorneys and public defenders who were qualified and available for trying the large number of homicide cases, as well as court scheduling practices.

Joseph B. Steele, who was an Assistant District Attorney trying homicide cases in 1975 testified to the following: He was the attorney assigned to try three cases in which Petitioner was charged: CC7505589 (involving the attempted murder and aggravated assault on Eula Everson); CC7505477 (involving the death of Ernest Rozier); and CC7505774 (involving the death of Thurman Everson). All three cases were listed for trial on December 15, 1975; the Commonwealth had anticipated the Everson cases would be consolidated for trial and that the Rozier case would be tried as soon as possible thereafter. However, after the court denied the motion to consolidate, jury selection on the Thurman Everson murder trial be-

gan on December 14, 1975, and on December 20, 1975. Petitioner was convicted of Third Degree Murder. The Eula Everson case could not be tried during the last two weeks of December because prospective jurors were unavailable. He (Steele) was on vacation until January 5, 1975, at which time he was scheduled to begin the case of *Commonwealth v. Charles Boyd*, an unrelated homicide. (However, that case was postponed to a later date.)

In addition to trying homicide cases Steele was in charge of the "Crimes Against the Person" section of the District Attorney's Office, which duties took up much of his time.

As to the possibility of another attorney in the office trying the Eula Everson case, Steele testified as follows:

I was saying that the reason this case couldn't easily be assigned to another District Attorney, number one, it had been my case for a long period of time. By that time we are talking about several months that it had been handled by me and no one else. The whole involvement had been done by me and no one else. There were complex difficulties in the case, not getting the witnesses in and dealing with two witnesses who were, you might say, hostile and certainly unwilling to be witnesses. And to lateral that to another District Attorney on a short notice would be pretty unrealistic. Remand Hearing Trans. 9/2/81, p. 27.

Further, the victim, Eula Everson, had speech difficulties and a "great fear" of testifying. Id. p. 11.

Finally, it appears that Petitioner's trial counsel, during pre-trial discussions, at least gave the impression to Steele that there was no objection to the Eula Everson and Rozier cases being tried after their original final trial dates (which would have been in mid-January, of 1976):

A.D.A. Zunich: "Q. Okay. Do you recall whether or not Mr. Nauhaus (Petitioner's trial counsel) had any reservations about the case [sic] not proceeding immediately

to trial, one after the other? Did he offer any strong objections as to what was forthcoming, the extension of time process—

Mr. Steele: A. No, not at all. It was my recollection and it is my recollection that he recognized in the course of his duties exactly what was going to be necessary and acknowledged that that is the way it was going to have to go.

Q. Okay. Based on my understan[d]ing of the homicide case load and that time period, the case of Commonwealth versus Charles Boyd, that was listed for January 5th, 1976 did not ultimately come off on January 5th, 1976 and in that regard is there any reason why at that point you could not have moved to get the Eula Everson case tried within the final trial date which was January 15, 1976?

A. Well, I don't know of any specific reason why. When the Boyd case came up on the 5th and ultimately turned out to be postponed, at this point we had already agreed upon—we had agreed for the time frame for the Eula Everson case. Those cases, as far as I was concerned,—both Rozier and Eula Everson—that that time frame was already fixed. That is my recollection. There was never any reason that we should move it up or ask to have it listed on the 6th or 7th or 8th of January because Mr. Nauhaus had already acknowledged and discussed the question of when that case would be listed.

Q. Were you surprised when he moved to dismiss these cases?

A. Yes, absolutely." Remand Hearing Trans. 9/2/81, pp. 13 and 14.

Under the circumstances it appears the Commonwealth did not violate Petitioner's Rule 1100 rights as to either the Eula Everson or Rozier cases.

Lower ct. op. at 2A–6A.